STATE of Indiana, Appellant
(Defendant below),

v.

Gary D. THOMPSON and Paul C.
Thompson, Appellees
(Plaintiffs below),

and

American Oil Company, Inc., Appellee
(former third-party Defendant below).

No. 1–177A10.

Court of Appeals of Indiana,
First District.

Jan. 29, 1979.

Rehearing Denied April 17, 1979.

Theodore L. Sendak, Atty. Gen. of Indiana, Robert S. Spear, Thomas D. Strodtman, Asst. Attys. Gen., Indianapolis, for appellant.

C. Richard Marshall, Robert L. Stevenson, Stevenson, Marshall & Silva, Columbus, Tom G. Jones, Jones, Loveall & Coachys, Franklin, for appellees, Gary D. Thompson and Paul C. Thompson.

Jim A. O'Neal, Cory S. Brundage, Ice, Miller, Donadio & Ryan, Indianapolis, for appellee, American Oil Co., Inc.

LYBROOK, Presiding Judge.

The State appeals from 1) an adverse judgment entered on a jury verdict in the amount of $1,240,000 in favor of Gary Thompson; and 2) a dismissal of the State's third-party complaint against the American Oil Company (Amoco) for indemnity. The theory of Thompson's complaint against the State was that the State "negligently marked, designed, constructed, engineered and maintained" a section of U. S. highway 31 at its intersection with Interstate highway 65 in Bartholomew County, resulting in an auto-truck collision in which Thompson received severe and permanent injuries.

The following issues are raised for our review:

I. Whether the State of Indiana is immune from suit for design defects in a State highway;

II. Whether there was sufficient evidence to support the jury's finding that the State's actions were the proximate cause of Thompson's injuries;

III. Whether Thompson's conduct constituted contributory negligence as a matter of law;

IV. Whether Thompson was limited to a recovery of $300,000 in view of

the provisions of the Indiana Tort Claims Act;[1]

V. Whether the trial court erred in granting Thompson's motions in limine and thus excluding all evidence of a loan receipt agreement executed between Thompson and certain defendants;

VI. Whether the court erred in excluding evidence of a covenant not to execute entered into between Thompson and certain defendants;

VII. Whether the alleged misconduct of a juror requires a new trial;

VIII. Whether the damages were excessive; and

IX. Whether the trial court erred in dismissing the State's third-party complaint against Amoco.

We affirm the judgment entered by the trial court on the jury's verdict in favor of Thompson and against the State; we further affirm the trial court's dismissal of the State's third-party complaint against Amoco.

### FACTS

On July 17, 1973, at approximately 10:15 P.M., Gary Thompson was driving south on four-lane U. S. highway 31 in northern Bartholomew County, approaching and then passing the Interstate 65/U.S. 31 intersection near Taylorsville. Riding with Thompson was his girlfriend, Debbie Thompson (now Miller). The pair had left a friend's trailer, where Gary had consumed three beers from about 8:40 P.M. to 10:10 P.M.

As the car proceeded south on U.S. 31, it was in the inside (or passing) lane next to the 48-foot grass median. Each lane of the four-lane highway was 12 feet in width.

Gary, driving at 60 to 65 miles per hour, was slowly passing and pulling away from another car which was in the outside lane. As Thompson's car approached the southern of two exits/entrances to the Amoco truck stop, located on the right (west) side of the southbound lanes, and in the southwest quadrant of the I-65/U.S. 31 interchange, Debbie noticed the side marker lights of a tractor cab near that exit but could not see the partially loaded flatbed trailer behind it. The tractor and trailer were owned and driven by Clyde Stephens and leased to the Jack Cole-Dixie Highway Company, a trucking company. The automobile continued toward the exit; Debbie then saw the trailer behind the tractor, and she suddenly realized that the trailer was blocking both lanes of the traveled portion of the highway. Debbie screamed; the car swerved to the right, but Gary was not able to maneuver very well due to the presence of the other car in the next lane. He slammed on the brakes and the car skidded 97½ feet into and underneath the 40-foot flatbed trailer immediately behind the trailer's rear tandems. The side beam of the flatbed trailer struck Gary's windshield and left front windshield pillar, and these items then struck Gary's skull causing permanent brain and brain stem damage along with other permanent and disabling injuries.

The evidence established that U.S. 31 in the area in question is a dual-lane, limited-access, north-south highway, which intersects near Taylorsville with Interstate 65. At this intersection are located three high volume 24-hour diesel truck stops.

The Amoco truck stop, situated in the southwest quadrant of the I-65/U.S. 31 intersection, had two commercial "cuts," or exits/entrances, onto southbound U.S. 31. When a truck exiting the Amoco truck stop headed north on U.S. 31, it first had to cross the southbound lanes, and, because the 48-foot crossover was not long enough to "shadow" or "store" the entire trailer while the driver waited for the northbound lanes to clear, he had to stop with the trailer blocking one or both of the southbound lanes of traffic while he waited for an opportunity to enter the northbound flow of traffic. Evidence established that these trucks often were loaded heavily and were slowly moving.

1. Ind.Code 34-4-16.5-1 *et seq.*

In July, 1973, the area where the accident occurred had no lighting. The crossover was located on a flat, gentle curve (bending left, or east, when southbound), and this curve made it difficult, especially at night, for southbound motorists before entering the curve to discern whether a stopped tractor and trailer were on the Amoco driveway, were blocking the southbound lanes, or were in the crossover. At nighttime this problem was aggravated when a tractor with a flatbed trailer was blocking the southbound lanes, since this type of trailer would have very little side surface to reflect a southbound motorist's headlights. Given the average distance of 300 feet for the reach of an automobile's headlights, and given the absence of a reflection off the side of a flatbed trailer, a driver proceeding at the legal speed limit, heading into and around the curve, might not be able to see the trailer until it was too late to stop.

Expert testimony showed that the area lacked warning and caution signs which could have advised southbound motorists of the dangers involved. There was one "Truck Entrance" sign which was 1,271 feet north of the crossover involved and 24 feet off the highway; thus it was also north of the northern exit/entrance to the Amoco truck stop, and expert testimony differed as to the sign's applicability to the crossover where the accident occurred. It was also questionable whether a southbound driver's headlights would illuminate the "Truck Entrance" sign, since it was so far (24 feet) from the highway. The positioning of this sign violated the State's Uniform Traffic Manual in at least two respects: 1) the sign was 24 feet from the road instead of 12 to 18 feet as required by the manual; and 2) the manual required that the sign be posted no more than 750 feet from the exit/entrance (compared with this sign's positioning 1,271 feet from the crossover exit at which the accident occurred).

In 1973 the general highway speed limit in Indiana was 65 m. p. h. unless otherwise indicated on a particular stretch of highway. Evidence conflicted at trial concerning the speed limit near the crossover. Plaintiff's expert, Joseph Harris, testified that according to the Uniform Traffic Manual the speed limit was 65 m. p. h. despite the State's attempt to lower the speed limit by posting a single 55 m. p. h. speed limit sign over a mile north of the crossover.

Harris testified that he was familiar with the Indiana Uniform Manual on Traffic Control Devices and its federal counterpart. The maximum speed limit for a road such as U.S. 31 in this area was 65 m. p. h. in July, 1973. According to the manual, before a speed reduction area is in effect there must be an absolute speed limit enacted by law pertaining to this area and there must be properly posted signs. For a speed reduction area of less than 5 miles in length, such as the attempted speed reduction in the area in question, the Uniform Manual required speed signs to be posted at least every one-half mile, and at the end of the zone it required a sign saying "Return to 65 m. p. h." or "End 55 m. p. h."; therefore, for a one-mile speed reduction zone, it was necessary to have a minimum of three signs. The manual also required a "Speed Limit Ahead" sign at least 1,000 feet before the speed reduction zone started with the "Begin 55 m. p. h." sign. Although all these signs were required to effect a reduced speed zone, the State had in place only one 55 m. p. h. speed limit sign, which was located over a mile north of the crossover.

▮ Since U.S. 31 was a declared limited-access highway, the Indiana State Highway Commission had control over the issuance of permits to allow the construction of cuts and driveways for businesses located near the highway. *See* Ind.Code 8–11–1–4.

Over the years several citizens had complained about the dangers of the intersection. From a review of the record it appears that the State's only response to these complaints was the placing of one 55 m. p. h. speed limit sign north of the intersection in 1973.

On October 5, 1964, Hildreth Smith wrote a letter to the State Highway Commission concerning the dangers of the I-65/U.S. 31 junction and noting that several fatal ac-

cidents and property damage accidents had occurred in the area. She specifically referred to the problems caused by slowly moving trucks entering U.S. 31 from the truck stops at the intersection. She recommended the installation of caution lights, signs warning of slowly moving vehicles, or a reduced speed zone.

Wilamay Powell wrote to Governor Edgar D. Whitcomb on May 30, 1972, complaining about the trucks exiting the truck stops at the I-65/U.S. 31 interchange. She specifically informed the Governor that, as she drove north on U.S. 31 on that date, a slowly moving truck pulled out from one of the truck stops and blocked the northbound lanes while the driver waited to make a left turn onto the southbound lanes. Mrs. Powell almost ran into the trailer behind the tractor. That afternoon as she was returning home, driving south on U.S. 31, a similar incident occurred, only this time the tractor-trailer pulled out of the Amoco truck stop and blocked the south bound lanes of traffic while waiting for the northbound lanes to clear. Again Mrs. Powell nearly ran under the truck's trailer.

Prior to Gary's accident, Bartholomew County Sheriff Jimmie McKinney had lodged complaints with the Indiana State Highway Commission concerning the area in which the collision occurred. On numerous occasions he had notified the local State Highway Commission in Columbus about the dangerous nature of the crossover where the accident occurred. To his knowledge the State took no action in response to his complaints.

On November 1, 1972, Marta Cuenca witnessed an accident at this same crossover, again caused by a truck blocking the southbound lanes because the driver could not store his trailer in the crossover. Mrs. Cuenca wrote a letter complaining of this situation to *The Republic*, a Columbus newspaper, and forwarded copies to the Governor, the Indiana State Highway Commission, the State Police, and the Bartholomew County Sheriff's Department.

In November, 1972, Robert D. Garton, a State Senator, informed in writing Dave Waggoner, then executive secretary of the Indiana State Highway Commission, that there was a problem with the intersection and especially with the median crossovers which did not allow enough space to prevent trucks from blocking lanes of traffic as they attempted to negotiate left turns when leaving the truck stops. Garton received a response from the Highway Commission saying that the Commission would look into it.

Concerning the injuries received by Gary, it is unnecessary to detail their precise extent and nature. Expert testimony established that he was suffering from post-traumatic encephalopathy with epileptiform tendencies. This condition is permanent. He has severe balance and seizure problems which make him virtually umemployable; on the other hand, Gary is expected to have a near normal life expectancy.

By Gary's 21st birthday his medical expenses were $37,906. Expert testimony established that the present value of Gary's future lost earnings was $533,000. Convalescent care will cost Gary from $700,408 to $1,260,735. These damages were exclusive of pain and suffering and any future medical expenses.

I.

The State first contends that it has residual sovereign immunity, even after our Supreme Court's decision in *Campbell v. State* (1972), 259 Ind. 55, 284 N.E.2d 733, and that such residual immunity shields the State from liability for design defects in State highways. This contention already has been decided adversely to the State in the case of *Indiana State Highway Commission v. Clark* (1978), Ind.App., 371 N.E.2d 1323, a case in which the State made a similar argument, and in which this court stated, at 1327:

"As is evident from the quote in its brief, *supra*, the State has misconstrued the respective meanings of private duty, public duty and discretionary act. In *Elliott v. State* (1976), Ind.App., 342 N.E.2d 674 this court held that the State has a

general duty to exercise reasonable care in designing, constructing, and maintaining its highways for the safety of public users. Therefore, as a result of the holdings in *Campbell, supra, Briggs* [*Board of Commissioners of Delaware County v. Briggs*, (1975) Ind.App., 337 N.E.2d 852] and *Elliott, supra,* sovereign immunity is not available to the State as a defense, and where the State has breached its duty of reasonable care, the State is liable for the damages which were proximately caused by that breach."

Having reaffirmed the principle that the State has a duty to exercise reasonable care in constructing, designing and maintaining its highways, and that there is thus no doctrine of residual sovereign immunity to protect the State from its negligent acts in connection with this duty, we can proceed to determine whether the State is to be held liable in the instant case.

## II.

The State next alleges that, even assuming arguendo that it was negligent, there was insufficient evidence produced at trial to prove that it was the proximate cause of Thompson's injuries. The State's position is that, even if the State were negligent in the signing, positioning of speed limits, lighting, designing and maintaining of the section of U.S. 31 in question, such negligence "merely furnished a condition by which Gary Thompson's injuries were made possible," and thus the real proximate causes of Thompson's injuries were 1) his failure to use reasonable care for his own safety; and 2) the actions of the truck driver.

The question whether the defendant's conduct caused the plaintiff's injury is a question of fact. *Meadowlark Farms, Inc. v. Warken* (1978), Ind.App., 376 N.E.2d 122. In determining the question whether there was sufficient evidence to support the jury's verdict on the issue of proximate cause, this court neither weighs the evidence nor judges the credibility of witnesses; rather, we examine that evidence, and logical inferences therefrom, supportive of the verdict, to determine whether there is sufficient evidence on each element of the plaintiff's case. *Meadowlark Farms, supra.*

Concerning the question of adequate evidence of proximate cause, it has been noted that:

"A cause is a necessary antecedent: in a very real and practical sense, the term embraces all things which have so far contributed to the result that without them, it would not have occurred. It covers not only positive acts and active physical forces, but also pre-existing passive conditions which have played a material part in bringing about the event." W. Prosser, The Law of Torts, 237 (4th Ed. 1971).

At times many causes will influence a result, but as a matter of public policy courts limit liability for negligent acts to the conduct which proximately caused the injury. Factual causation becomes proximate causation under the test of foreseeability. *Swanson v. Slagal* (1937), 212 Ind. 394, 8 N.E.2d 993; *State v. Dwenger* (1976), Ind.App., 341 N.E.2d 776; *Meadowlark, supra.*

In *Meadowlark* it is stated, at 129:

"One's negligence may furnish a mere condition for the incidence of another's negligence and allow the original actor to escape liability. *Schroer v. Funk & Sons, Inc.* (1968), 142 Ind.App. 223, 233 N.E.2d 680; *Slinkard v. Babb* (1953), 125 Ind. App. 76, 112 N.E.2d 876. If true, such negligence was not the active or efficient cause of the resulting injury. *However, the ultimate test of legal proximate causation is the reasonable foreseeability.* The assertion of an intervening, superseding cause fails to alter this test. *City of Indianapolis v. Falvey* (1973), [156 Ind. App. 366], 296 N.E.2d 896. For this Court to affirm a positive finding of proximate causation, we need only conclude that the evidence presented supports a reasonable conclusion that the original wrong was one of the proximate rather than remote causes." (Original emphasis.)

Furthermore, when a defendant has been shown to have knowledge that independent and intervening forces might occur and result in damage or injury due to the effects of the defendant's negligence, he cannot escape liability by claiming that the specific manner in which the damage or injury occurred was foreseeable. *Johnson v. Bender* (1977), Ind.App., 369 N.E.2d 936.

At trial there were over 1,200 pages of testimony from 29 witnesses; there were also numerous exhibits. We will not attempt to detail all evidence establishing the element of proximate cause. We believe that the following testimony of plaintiff's witness, Joseph Harris, in connection with the facts set out *supra,* presents a *prima facie* case of negligence from which the jury was allowed to infer that the State was the proximate cause of Thompson's injuries:

"Q. . . . Mr. Harris, do you have an opinion as to whether any or all of these deficiencies and problems in the area that you've talked about, whether they proximately caused or contributed to the collision of July 17, 1973 involving Gary Thompson?

A. Yes, Sir, I do.

Q. Would you state your opinion to the Jury, Sir?

A. They did. The signing problem contributed in that it didn't warn of the presence of a truck, of the presence of crossing trucks, of the presence of the curve, of the presence of the intersection itself. The lighting problem meant that the driver of the car, uh, was so close to the intersection by the time he recognized that there was a flatbed trailer there that there was nothing anymore he can do to avoid it. He can't steer to avoid it, he can't brake to avoid it, he cannot avoid it. Had this area been properly lighted you would be given [sic] the driver of—of the car, instead of demanding that he take two and a half seconds to perceive and react to what's there, exclusive of any deci-sion, you change that time to, uh, uh, less than a third, to three-quarters of a second, which means that you make it, uh, highly likely that now he'll stop if you've changed nothing else in this area but given him the ability to see what's there. Thirdly, if you eliminate the storage problem or you control it, which is really the basic problem, you can't store the trucks, surely you eliminate this kind of accident. The reason for going to traffic controls, the reason for going to proper signing, when you—when you're dealing with very large, long vehicles, slow moving vehicles, is you must eliminate the—the—the dangers that they impose, which is really blocking on-coming high speed traffic. So, if you get rid of these problems you get rid of this accident.

Q. Mr. Harris, do you have an opinion as to whether Gary Thompson or the truck driver or both of them could have avoided this collision?

A. Yes, I do.

Q. Would you state that opinion to the Jury, please?

A. Once that truck begins to move, uh, there's nothing more that that truck driver can do. No matter what he does, he can't do it fast enough. He can't get that truck anywhere in, to hide it, it's too big to hide. He can't get it into the median. It won't even fit. But he can't get it out of the way. More particularly he certainly can't change the— the— the lighting on the side of the trailer, which isn't particularly visible, but once he starts to go his actions are irrevocable. He's putting a barrier across that road and there's nothing he can do to get it out of the way in time. And if you look at the driver of the car, the driver of the car somehow has to know that there is a hidden low flatbed trailer behind that cab, he can see the cab, 800–700 feet away, but he can't see that

flatbed trailer, and if you're asking should he have been able to see it, no, not if he's an ordinary driver, not if he's an ordinary person. And there's then nothing he can do when he finally does see it and react to it, and he surely reacts. He reacts, he steers and he brakes and you can't ask more of—of the ordinary driver of a car other than steering and braking. He braked as hard as he could and he obviously steered hard. There is no way he can avoid this accident because you haven't told him—you haven't signed properly, you haven't lit the area properly and you haven't provided any storage facility for that truck. So, once that truck begins to move this accident is—is irrevocable."

The jury was free to believe or disbelieve any or all of the testimony of Harris and plaintiff's other witnesses. We hold that in view of this testimony and all the facts set out *supra*, and especially in view of the fact that the State had several prior warnings about the extremely dangerous condition of this stretch of highway but ignored the problem, the jury was justified in finding that the State could well have foreseen the consequences of its actions and consequently that the actions complained of were the proximate cause of Thompson's injuries.

We are not prepared to dictate to the State the precise manner in which it could, or should, have attempted to remedy the situation. The State declares in its brief that "at the time of the accident the State, though having the power of eminent domain, had no right under law to prevent the use of the private drive nor sever the right of ingress and egress to the Standard [Amoco] Truck Plaza without payment of just compensation . . ." The State apparently argues that when it was confronted with prior warnings of the dangers of this intersection, it was faced with either 1) closing the truck stops entirely, in which case it argues that it would have had to condemn this property under state eminent domain procedures; or 2) doing nothing at all, which it did.

We decline to adopt this simplistic approach and we doubt that the State was required, under the "reasonable man" standard, to condemn the truck stops. The duty imposed upon the State was to act reasonably under the circumstances. Many alternatives could have been attempted to mitigate the dangers of this area. First, there was the possibility of lighting it or posting signs to warn of the curve, the truck entrance, the median crossover, or slowly moving vehicles. An automatic traffic control device might have been installed. A caution light or sign could have been erected. The State could have lowered the speed limit in the area in question by complying with its own manual in the posting of speed limit signs. Additionally, the permit application, whereby Amoco received permission to construct the entrance in question, provided as follows:

"The permittee [Amoco] shall remove or relocate any such entrances or approaches when requested to do so by the Commission in the interest of safety to highway traffic. . . . Permits issued for driveway entrances and approaches may be rescinded at any time by the Indiana State Highway Commission. . . ."

The State has offered no reason why this provision could not have been invoked to require Amoco to redesign its entrance. Indeed, without so holding, we believe the State has extensive powers in regard to the redesigning of entrances of limited-access highways. Ind.Code 8–11–1–4 provides, *inter alia*, that the Highway Commission may:

". . . regulate, restrict or prohibit access as to best serve the traffic for which such [limited-access] facility is intended . . . No person shall have any right of ingress or egress . . . except at such designated points at which access may be permitted, . . ."

*See also* Ind.Code 8–11–1–7, which gives the State the power to eliminate intersections for purposes of safety upon limited-access highways.

Finally, in connection with the plaintiff's allegation that the State was negligent in its design of the area in question, we note the fact that considerable testimony was directed to the proposition that the truck driver could not "store" or "shadow" his trailer in the crossover when he pulled out of the truck stop. Significantly, when Amoco first designed the exit/entrance in question in its application for a permit, Amoco's design called for the construction of a new, obliquely-angled crossover which would have stored completely the length of the tractor and trailer in the present case. That design was rejected by the State, and the eventual location of the exit/entrance was immediately across from an existing, right-angled median crossover. Additionally, this exit/entrance was placed further into the curve in accordance with the State's suggestions.

Again, we do not wish to dictate to the State which measures mentioned *supra* it should have employed to meet its duty of reasonable care under the circumstances. However, we hold that evidence of the State's failure to attempt any of these remedies, other than in a half-hearted manner, was sufficient evidence from which the jury could find that the State had breached its duty, and that this breach was the proximate cause of Thompson's injuries.

### III.

The State next contends that, even assuming negligence and proximate causation on the part of the State, Thompson is barred from recovery because the evidence shows that he was contributorily negligent as a matter of law. The State argues that the following facts establish such contributory negligence: first, there was a "Begin 55 m. p. h." sign over a mile north of the crossover. However, the State's argument does not mention the fact that pursuant to its own traffic manual the speed zone created by this solitary sign, if in fact there was one created, extended for only one-half mile from the sign. Thus it ended over three-fourths of a mile north of the crossover where the accident occurred.

The State next asserts that Thompson's consumption of three beers beginning at 8:40 that night was a sufficient demonstration of his contributory negligence. The State ignores, however, the evidence which showed that Thompson's blood alcohol content was .04 percent at the time and that this figure was well below the .10 percent at which a person statutorily is presumed to be intoxicated. Ind.Code 9–4–1–56(2).

The question of contributory negligence is a question of fact for the jury. Only when it can be said as a matter of law that no reasonable man would have acted as plaintiff did under the circumstances does the issue of contributory negligence become an issue to be decided by the court. *Meadowlark Farms, Inc. v. Warken* (1978), Ind. App., 376 N.E.2d 122.

The evidence at trial differed as to the reasonableness of Thompson's actions on the night of the accident. However, we believe that the evidence falls far short of the quantum necessary for this court to hold, as a matter of law, that Thompson was contributorily negligent. That question was properly left to the jury.

### IV.

The State next argues that, even assuming its negligence, its proximate causation and a lack of contributory negligence on the part of Thompson, the State is liable for a maximum of only $300,000 under the provisions of the Indiana Tort Claims Act, Ind.Code 34–4–16.5–1 *et seq.*

The timing and sequence of events in the case at bar present the question whether the legislature has limited a tort claimant's recovery against the State to $300,000 in cases accruing before the effective date of the Tort Claims Act. The sequence of events is as follows:

1) On July 17, 1973, the accident occurred;
2) On September 20, 1973, Thompson filed his complaint;
3) On February 19, 1974, the Tort Claims Act, which limits recovery from the State to $300,000 for any one occurrence, became effective; and

4) On July 20, 1976, judgment was entered in favor of Thompson.

Thus the injury and the filing of the complaint occurred prior to the effective date of the Act, but the judgment was rendered after that date.

This precise question has yet to be decided in Indiana, but we believe that *State v. Daley* (1975), Ind.App., 332 N.E.2d 845, is helpful in understanding the issues involved.

In *Daley* the plaintiff's loss and his acquisition of a judgment occurred prior to the effective date of the Act; however, he sought to enforce the judgment after the Act became effective. The State argued that the Act was to be read retroactively, and that the plaintiff therefore could not recover above $300,000.

Our court first decided that the Act was not to be read retroactively, and it said, in 332 N.E.2d at 848:

"The section limiting recovery is silent as to retroactivity, and the appropriations section does *not* say that claims 'which have been . . . obtained' are limited to $300,000. Indeed, the Attorney General has the *duty* to present vouchers for past and present claims, and there is nothing expressed or implied that said vouchers should be limited to $300,000. We conclude that the Act should be read to mean that appropriations have been made for past judgments *in full*, but that claims obtained after February 19, 1974, will be limited by the Act to the amount stated therein." (Emphasis in the original.)

Throughout the Act there is a distinction between "claims" and "judgments". For example the Act states that "[t]here is hereby appropriated from the general fund of this state sufficient funds to settle claims and to satisfy tort judgments . . ." Also, one seeking to recover from the State first must give notice of his "claim" prior to filing suit.

Keeping this distinction in mind in examining the *Daley* case, it is clear that the statement "but that claims obtained after February 19, 1974, will be limited" implies that claims obtained prior to February 19, 1974, are not subject to the limitation of the Act. In view of the distinction drawn between the terms "claims" and "judgments" throughout the Act and in *Daley*, we hold that Thompson "obtained" his claim at the time of the accident and thus is not subject to the limitation of the Act.

It has long been the public policy of this State to insure that every aggrieved citizen has a full and complete opportunity to present his case in court. In the instant case, Thompson's accident and injuries presented legal and factual issues of tremendous complexity; the preparation of this case understandably consumed many months. Were we to hold that his failure to race to judgment before February 19, 1974, precluded his recovery of more than $300,000, we would be encouraging the hasty and slip-shod preparation of difficult cases. Additionally, proper preparation of the State's case would have extended beyond the crucial February 19, 1974 date. Thus, in view of the language of the Act, the decision in *Daley, supra*, and our policy favoring the opportunity for every party to prepare its case fully, we hold that "claims obtained" prior to the date of the Act are not limited to a recovery of $300,000, regardless of the date on which judgment is entered.

### V.

The State next contends that the trial court erred in 1) "recognizing" the loan receipt agreement between the Thompsons on the one hand, and the truck driver and owner (Jack Cole defendants) on the other; and 2) granting plaintiffs' motions in limine to exclude all evidence of such agreement.

Under the terms of the loan receipt agreement, which was filed with the trial court prior to trial, the Thompsons were to prosecute their claims against the State of Indiana and to dismiss with prejudice their case against the Jack Cole defendants. In consideration of this agreement the Jack Cole defendants loaned the Thompsons $225,000; the Thompsons agreed to repay

this amount, without interest, only to the extent they successfully collected on their claim against the State; failing recovery from the State, the Thompsons would not repay the loan.

The State first argues that to allow the use of such agreements would be to allow contribution or indemnity among joint tort-feasors, contrary to Indiana law; thus, according to the State, the trial court "erred in recognizing the agreement . . ."

We disagree with the State's position, and we hold that the agreement in question was neither contribution among joint tort-feasors nor was it indemnity.

Loan receipt agreements have been held valid in Indiana as early as the decision in *Klukas v. Yount* (1951), 121 Ind.App. 160, 98 N.E.2d 227. Since the decision in that case there has been a series of cases discussing, and approving, loan receipt agreements as a means of settling litigation prior to trial. *See Northern Indiana Public Service Company v. Otis* (1969), 145 Ind.App. 159, 250 N.E.2d 378, 385–393; *American Transport Company v. Central Indiana Railway Company* (1970), 255 Ind. 319, 264 N.E.2d 64, 65–67; *Scott v. Krueger* (1972), 151 Ind. App. 479, 280 N.E.2d 336, 339, 350–358; *Burkett v. Crulo Trucking Co., Inc.* (1976), Ind.App., 355 N.E.2d 253, 258–261; *City of Boomington v. Holt* (1977), Ind.App., 361 N.E.2d 1211, 1214–1217, and *Geyer v. City of Logansport* (1977), Ind., 370 N.E.2d 333, 337–338. In view of the holdings of these cases we do not need to discuss further the court's action in regard to "recognizing" the loan receipt agreement; we also decline the State's invitation to reverse or modify the above decisions. However, whether the agreement should be admitted into evidence, as the State contends, is a question which has not been settled in this State, at least in connection with facts similar to those in the case at bar.

■ The State first argues that, upon execution of the agreement between the Thompsons and the Jack Cole defendants, the latter became real parties in interest and their presence as such should have been revealed to the jury. *See* Ind.Rules of Pro-cedure, Trial Rule 17(A). However, this agreement is essentially only a different version of the situation in *Klukas, supra*, in which this point was decided adversely to the State's present position. In the *Klukas* case the plaintiff-appellee was a passenger in defendant-appellant's taxicab when it collided with another car whose driver was insured by an insurance company which sought to, and did, secure an out-of-court settlement with the plaintiff via a loan receipt agreement. Under that agreement the plaintiff-appellee was to repay the insurance company only to the extent of his recovery against the taxi owner, or the amount of the loan, whichever was less. The appellate court rejected the defendant-appellant's arguments that the insurance company thereby became the real party in interest, or that the insurance company was subrogated to the plaintiff-appellee's claim against the defendant taxi owner. We find this case controlling and hold that the Jack Cole defendants in the case at bar did not become the real parties in interest; it follows then that we need not discuss the assertion that their status as such was required to be revealed to the jury.

There remains, however, the question whether the trial court erred in refusing to allow the agreement into evidence to impeach the credibility of certain witnesses. Apparently this question has not been decided in Indiana.

■ We agree with those foreign cases which hold, as a general proposition, that when a loan receipt agreement is executed between a plaintiff and a defendant, and that defendant, or one of his agents or representatives, appears at trial and testifies for the plaintiff, the loan receipt agreement should be admissible to impeach his testimony. That such a witness would have a pecuniary bias is obvious, for if he testifies persuasively in plaintiff's favor, he will be more likely to recover his loan to the plaintiff. As stated by the Supreme Court of Illinois in *Reese v. Chicago, Burlington & Quincy Railroad* (1973), 55 Ill.2d 356, 303 N.E.2d 382, at 387:

"Defendant Koehring [not a party to the loan receipt agreement] argues that the use of loan agreements tends to undermine the adversary nature and integrity of the proceedings against the remaining defendant. To a limited extent, we agree. It seems not unlikely that, where a defendant has executed a loan-receipt agreement with a plaintiff who thereupon dismisses that defendant and proceeds against the remaining ones, the employees and witnesses of the dismissed defendant may be substantially more cooperative with plaintiff than would otherwise be true, since any recovery by that defendant of the loaned amount is frequently contingent upon plaintiff's success against the remaining defendants. To some degree the same may be said of many third-party actions. But we believe adequate protection for those defendants exists if by cross-examination they are permitted to establish that a witness knows of the existence of a loan agreement, and if so, that the witness may be biased or prejudiced as a result thereof. In the event that the existence of such agreement is established, an appropriate instruction limiting the effect of the admission into evidence of the loan-receipt terms might be given at the request of any party."

*See also Bedford School District v. Caron Construction Company* (1976), 116 N.H. 800, 367 A.2d 1051, and *Klotz v. Lee* (1955), 36 N.J.Super. 6, 114 A.2d 746.

In the *Bedford School District* case it is noted, at 1054, that:

". . . full disclosure to the jury may be prejudicial to the nonagreeing defendant. The very existence of the agreement may suggest to the jury that at least one defendant feels that the plaintiff should recover and that the nonagreeing defendants should pay. [Citations omitted.] Also, knowing that the agreement will be presented to the jury, the parties might fill it with self-serving recitals that inculpate the nonagreeing defendant. [Citations omitted.] Full disclosure might also unduly prejudice the plaintiff. For example, if the jury is told the amount which the defendant agreed to pay, it might erroneously conclude that the sum is the plaintiff's estimate of his damages. Thus, many courts have refused to permit disclosure of the dollar amount of 'Mary Carter' agreements. [Citations omitted.] Even though the South Dakota Supreme Court was aware of the evils of such agreements and advocated disclosure of most of their details, it stated: 'We can visualize no circumstances where the amount involved in a release or covenant need be disclosed (to) the jury.' *Degen v. Bayman*, 200 N.W.2d 134, 139 (S.D.1972); *See Moore v. Young*, 263 N.C. 483, 139 S.E.2d 704 (1965). The plaintiff also might be prejudiced if the agreement is admitted substantively as evidence of liability because the jury might conclude that the responsible party has already come forward and settled and, if the other defendants were liable, they would have settled too. The final aspect of the disclosure problem is that admission of these contracts into evidence tends to discourage settlements, contrary to public policy. [Citations omitted.] A party is not likely to enter into a settlement if the agreement may be admitted before the jury as evidence of his liability. C. McCormick, The Law of Evidence § 274 (2d ed. 1972). *Those cases that have considered the matter have held that the 'Mary Carter' type agreement is admissible only for the purpose of impeaching the testimony of the agreeing party.* Reese v. Chicago, Burlington & Quincy R. R. Co., 55 Ill.2d 356, 364–65, 303 N.E.2d 382, 387 (1973); *see Pellett v. Sonotone Corp.*, 26 Cal.2d 705, 160 P.2d 783 (1945)." (Emphasis added.)

It should be stressed, however, that in the case at bar none of the Jack Cole defendants (or their agents or representatives) appeared at trial and testified; accordingly, we must deal only with the question whether the agreement could be used to impeach the testimony of witnesses other than those connected with the Jack Cole defendants.

The State contends that the agreement should have been admitted to impeach the

Thompsons' testimony, for in executing the agreement they became "contractually interested" in the outcome of the case; the State therefore implies that the existence of the agreement gave the Thompsons such an additional interest in winning their case, and in obtaining a large judgment in order to meet the obligations under the agreement and still have a large sum for themselves, that they necessarily slanted their testimony. We find this reasoning unpersuasive.

More logically, it would appear that a party seeking monetary damages in tort for his injuries is understandably interested in getting as large a recovery as possible; obviously he need not have a loan receipt agreement with a dismissed defendant before he becomes biased in favor of his own case. The additional bias, if any, that such an agreement may produce is not such an inherent danger that the agreement must be shown to the jury. We believe that the jury would be more likely to be misled or confused by the introduction of the agreement. Therefore, we hold that the Thompsons' interest in the loan receipt agreement was not so great that their testimony necessarily would be biased to such an extent that the admission of the agreement into evidence would be warranted. We find this holding to be consistent with those well-reasoned decisions from other jurisdictions which have considered similar problems, *Reese, supra,* and *Bedford School District, supra,* as well as with the only Indiana decision which has approached similar issues.

In *City of Bloomington v. Holt* (1977), Ind.App., 361 N.E.2d 1211, where the existence of a loan receipt agreement had been revealed to the jury through an instruction, this court stated, in response to appellant's argument to the contrary, that it saw no reason why the *amount* of the settlement contained in the agreement should be revealed to the jury. The issue was not squarely decided, however, due to the appellant's waiver of it on appeal. Our decision in the case at bar is consistent with the rationale of the *Holt* case.

Accordingly, the trial court committed no error when it granted plaintiffs' motions in limine to prevent the admission into evidence of the loan receipt agreement.

## VI.

The State next alleges that the trial court erred in excluding from evidence the agreement entered into between the Thompsons and certain defendants whereby the Thompsons agreed not to execute against those parties. The substance of this agreement, dated July 17, 1975 was that the Jack Cole defendants would reveal to the Thompsons certain unnamed persons or entities, and legal theories assertable against them, which might enable the Thompsons to recover a judgment in a significant amount. In return for this the Thompsons agreed not to execute any forthcoming judgment against the Jack Cole defendants prior to complete exhaustion of all appeals and remedies in execution of any judgment against the State. This agreement was executed approximately one year before trial and, upon its execution, copies immediately were sent to all parties and to the court. Ultimately the Thompsons decided not to pursue the defendants and legal theories revealed by the Jack Cole defendants pursuant to this agreement.

The State contends that this agreement "casts a cloud" on the Thompsons' lawsuit, and that it shows how "desperate" the plaintiffs were to recover. This "desperation," argues the State, reflects on the plaintiffs' credibility, and thus the agreement should have been allowed into evidence to impeach the plaintiffs' testimony. Finally, in an argument similar to that posed under issue V, *supra,* the State contends that by the execution of this agreement the Thompsons' financial interest in the result of this case became so acute that they necessarily distorted their testimony.

Significantly, the State has not been able to cite any authority which holds that such agreements are relevant to either the substantive issues of the case or the credibility of any witness. We agree with

the State that the general rule regarding the admissibility of facts in connection with the impeachment of a witness' testimony is that any fact which tends to reflect upon the veracity of that testimony may be introduced to impeach the witness. *Acker v. State* (1959), 239 Ind. 466, 158 N.E.2d 790. However, we hold that the effect, if any, which this agreement would have had on the testimony of the Thompsons is too speculative and tenuous to justify the potential confusion the introduction of this agreement could have had among the jurors. As noted above, the other parties to the agreement were dismissed and did not testify at trial; thus the agreement presents no issue as to the credibility of those parties.

We therefore hold that the trial court committed no reversible error in excluding this agreement from evidence.

## VII.

The State next contends that the misconduct of a juror necessitates the granting of a new trial of this cause. The misconduct alleged is that a certain juror, a Mr. Wathne, had been a client of a law partner of one of the Thompsons' attorneys at trial, Tom Jones. The State argues that Mr. Wathne's failure to reveal this relationship to the State during *voir dire* was prejudicial to the State and requires a new trial.

The transcript of the record of *voir dire* shows that Mr. Wathne was seated in the jury box during the time the following remarks were made to the jury by plaintiffs' counsel, Mr. Jones:

"MR. JONES: Good morning, ladies and gentlemen. My name is Tom Jones, I'm a practicing attorney here in Franklin, Indiana. I practice with the law firm of Jones, Foster and Loveall, up here on Main Street. I'm one of the attorneys who represents the Plaintiffs in this case, Mr. Gary Thompson . . ."

On later *voir dire*, Mr. Jones asked Mr. Wathne:

"Q. Now, do you know, excuse me, any of the attorneys or the parties in this case?

A. . . ." [Evidently no response from the proposed jurors.]

When the jury was passed to the State it questioned:

"Q. Mr. Jones may have covered this individually in his questions to you; but in the event that he didn't, let me ask you this question, addressing it to all of you at the same time. Do any of you know any of the parties or their attorneys in this case, and if so, raise your hands."

Again, Mr. Wathne made no response to this question.

In its motion to correct errors the State included certified copies of certain records of the Franklin City Court which showed Mr. Wathne had been represented in that court in two separate traffic cases by Kenard Foster, who was once a law partner of Tom Jones.

It is the State's position that these facts demonstrate that it was denied a fair trial by an impartial jury. Specifically, argues the State, had it known of the lawyer-client relationship existing between Mr. Wathne and the partner of Mr. Jones, it would have used a preemptory challenge to exclude Mr. Wathne.

We agree with the State that failure of a juror to disclose information solicited by counsel on *voir dire* is available grounds for a new trial. *Cleveland, C., C. & St. L. Ry. Co. v. Osgood* (1905), 36 Ind.App. 34, 73 N.E. 285, as modified by *Stevens v. State* (1976), 265 Ind. 396, 354 N.E.2d 727, and *Johnston v. State* (1958), 239 Ind. 77, 155 N.E.2d 129. However, we disagree with the State in its assumption that the witness withheld information directly solicited by counsel.

It is standard practice on *voir dire* for counsel to ask prospective jurors whether they know any of the parties, their attorneys, or *their attorneys' associates* in the particular case at issue. Obviously should any of the jurors be acquainted with any of the persons in these categories it would be in the interest of all parties to know of this in order to exercise either their right to

challenge a juror for cause or peremptorily. However, the State in the case at bar did not phrase its question in a manner to include all the groups mentioned above, for the State asked, "Do any of you know any of the parties or their attorneys in this case, . . ." We have not been directed to any portion of the record which would show that the question concerning parties' attorneys' associates ever was before the jury. We therefore hold that the failure of Mr. Wathne to inform the State that he had been represented at one time by a partner of Mr. Jones does not constitute reversible error in view of the State's failure to pose a precise question to that effect. We further hold that the State has demonstrated no material misconduct which would have had any effect upon the verdict. *Homestead Farms, Inc. v. State* (1976), Ind.App., 343 N.E.2d 822.

## VIII.

The State next contends that the damages awarded by the jury were excessive, and that the jury was motivated by prejudice, passion, partiality or corruption. The State's argument proceeds along two lines: 1) that the jury returned a $1,240,000 verdict for Gary Thompson while returning no verdict at all for Gary's father who had shown special damages in the amount of $37,960; and 2) that this is the largest personal injury verdict entered to date in Indiana. We find no merit whatsoever in either of these arguments.

Regarding the proposition that the jury's failure to return a verdict for Gary's father "indicates a spoiled jury returning a sympathy verdict," we note that the State has failed to direct our attention to any authority which would support the notion that the failure of a jury to return a verdict for one plaintiff automatically vitiates as excessive the verdict returned for the other plaintiff. The conclusion is simply a *non sequitur* of the proposition.

Turning to the correct way to determine whether a verdict is excessive, we first must reconsider the evidence introduced at trial. It showed the following expenses incurred or to be incurred as a result of the accident.

| | |
|---|---|
| Present value of Gary Thompson's future lost wages (date of trial to end of work-life expectancy, 38.8 years) | $ 533,856.00 |
| Present value of the cost of future custodial care (date of trial to end of 47.8 years of additional life expectancy) | $ 700,408.00 |
| Gary Thompson's past medical expenses incurred from his 21st birthday to trial date | $ 12,705.91 |
| Two years' past lost wages (8–15–74 to 8–15–76) | $ 17,108.00 |
| Total | $1,264,077.91 |

Thus Gary's special damages, as proven in the trial court, were in excess of the $1,240,-000 verdict without even considering the questions of pain and suffering or disfigurement.

In *State v. Daley* (1972), 153 Ind.App. 330, 287 N.E.2d 552, this court stated, at 556:

"For a formula then, our common law sets only the general guidelines for compensating the victim, each in its own way to be considered by the trier of facts and weighed to determine what the total compensation will be. Because of this personal nature of each case and since the decision is unique to the particular set of facts our courts have said *the trier of facts is to be given 'sound discretion,' and 'liberal discretion'* where damages cannot be defined and calculated with mathematical certainty or by any exact standard. [Quoting *Kavanagh v. Butorac*, (1967) 140 Ind.App. 139, 221 N.E.2d 824.] An awareness of general inflation and a constant depreciation and cheapening of money is within the zone of discretion given to the trier of facts when assessing damages. *New York Central Railroad Co. v. Johnson* (1955), 234 Ind. 457, 127 N.E.2d 603; *Hahn v. Moore* (1956), 127 Ind.App. 149, 133 N.E.2d 900, 134 N.E.2d 705; [Citation omitted].

In order to justify a reversal on grounds of excessive damages, the amount of damages assessed must appear to be so outrageous as to impress the

court as being motivated by passion, prejudice and partiality. [Citations omitted.]

Reversal is not justified, however, if the amount of damages awarded is within the scope of the evidence before the court. *Northern Indiana Public Service Co. v. Otis, supra; First Bank & Trust Co. of South Bend v. Tellson* (1954), 124 Ind.App. 478, 118 N.E.2d 496." (Original emphasis.)

We hold that the evidence presented at trial amply supports the verdict. Accordingly the State has presented no reversible error on the subject of the amount of the jury's verdict.

### IX.

Finally, the State contends that the trial court erred in sustaining Amoco's T.R. 12(B)(6) motion to dismiss the State's third-party complaint filed against it. The State contends that it has a valid claim against Amoco for indemnification for any amount the State may be forced to pay in the present case. The State's complaint against Amoco reads in pertinent part as follows:

"1. That on or about July 18, 1967, the American Oil Company, submitted an application for a permit to construct a driveway entrance and approach, Number 58126, for a driveway and approach located on State Road 31, Section G3, 0.5 miles north of the City of Taylorsville, County of Bartholomew, State of Indiana, at the U.S. 31 and I–65 Interchange on the west side of U.S. 31 in the southwest quadrant thereof. . . .

2. That on or about January 18, 1968, said application was accepted and approved by the Indiana State Highway Commission.

3. That said application No. 58126 included the following provision:

'(n) The permittee shall assume all responsibility for any injury or damage to persons or property resulting directly or indirectly from the construction of any approach or driveway.'

4. That said application No. 58126 was for construction of a driveway to be used as a commercial entrance for the American Oil Company Truck Stop and Gasoline Station, located at State Road 31, Section G3, 0.5 miles north of the City of Taylorsville, County of Bartholomew, State of Indiana at the U.S. 31 and I–65 Interchange on the west side of U.S. 31 in the southwest quadrant thereof.

5. That the original plaintiffs, Gary D. Thompson and Paul C. Thompson have alleged negligent acts and omissions [sic] of defendant, State of Indiana, and the Indiana State Highway Commission at the location given, *supra.*

6. That the responsibility for any injury or damage to persons or property resulting from said driveway at said location was that of the American Oil Company as per paragraph (n) of Application No. 58126, *supra.*

7. That if defendant, State of Indiana, is held liable to plaintiffs and is obligated to pay plaintiffs any damages or judgments resulting from their complaint, the American Oil Company must be required by the terms of its contractual agreements and by reason of all other applicable implied and common law indemnity, to indemnify, hold harmless and pay all these sums on behalf of the defendant, State of Indiana.

WHEREFORE, defendants, and third-party plaintiffs, State of Indiana and Indiana State Highway Commission, pray that this third-party complaint be granted and the American Oil Company, Inc. be brought in as a third-party defendant and for all other proper relief."

Concerning the correctness of the trial court's granting of a T.R. 12(B)(6) motion to dismiss, we must stress again that this court will sustain such a dismissal only when the complaint shows on its face that the plaintiff is not entitled to relief. As our Supreme Court said in *State v. Rankin* (1973), 260 Ind. 228, 294 N.E.2d 604, at 606:

"This Court has noted that in a typical 12(B)(6) situation, a complaint is not subject to dismissal unless it *appears to a certainty* that the plaintiff would not be entitled to relief under *any set of facts.* [Citations omitted.] The rules do *not* require that the complaint state all the elements of a cause of action. It must be remembered that our new rules are based on so-called notice pleadings in which a plaintiff essentially need only plead the operative facts involved in the litigation. Other means less drastic than dismissal of the action can be used to clarify the theory and basis for the cause of action. Among these are a Motion for a more definite statement under TR. 12(E), our very broad discovery rules, and the pretrial conference under TR. 16(A)(1). We might note that certain cases from the Court of Appeals apparently state that the plaintiff is required to state in his complaint the theory upon which his claim is based. See, for instance, *Cheathem v. City of Evansville* (1972), [151] Ind. App. [181], 278 N.E.2d 602. Although a statement of the theory may be highly desirable, it is not required. When no evidence has been heard or no affidavits have been submitted, a 12(B)(6) motion should be granted only where it is clear from the *face* of the complaint that under no circumstances could relief be granted. The above stated principles concerning TR. 12(B)(6) generally are equally applicable to a TR. 17(A) real party in interest objection brought under Tr. 12(B)(6)." (Original emphasis.)

█ With this standard in mind we approach the issue whether the State has presented a sufficient complaint to withstand a T.R. 12(B)(6) motion. We conclude that it has not.

█ Although Amoco has presented several theories to justify its position that the State is, as a matter of law, not entitled to relief against it, we shall only discuss the question whether the contract on which the State relies in its attempt to impose an indemnity obligation upon Amoco is sufficient to do so. We hold that the language of this contract, contained in the permit application by which Amoco sought approval of its plan for a "cut" in the highway is insufficient to create an indemnity obligation under Indiana law.

█ First, it should be noted that "when any pleading allowed by these rules is founded on a written instrument, the original, or a copy thereof, must be included in or filed with the pleading." T.R. 9.2(A). This the State correctly has done in relation to the purported indemnification clause. However, we must assume that the State's attempt to establish indemnification rests exclusively on this permit, since the State has included no other written documents in the complaint. Furthermore, although the State apparently argued at trial that it could recover from Amoco under a theory of implied or common law indemnity, it presented no such issue to this court on appeal. This argument is therefore waived. *Adkins v. Elvard* (1973), 155 Ind.App. 672, 294 N.E.2d 160; A.R. 8.3(A).

█ Additionally, in our examination of the complaint we must remember that in Indiana, in order for an indemnitor to be liable for the indemnitee's own negligence, there must be a written contract between the parties which contains a clear and unequivocal provision by which the alleged indemnitor knowingly and willingly assumes the onerous burden of indemnification for the indemnitee's negligence. *Indiana State Highway Commission v. Thomas* (1976), Ind.App., 346 N.E.2d 252. Finally, we reaffirm the position in Indiana that the construction of a contract is a question of law where there is no ambiguity alleged to have arisen due to extrinsic facts and where the language of the contract is clear. *Clyde E. Williams & Associates v. Boatman* (1978), Ind.App., 375 N.E.2d 1138. Thus, in view of the above authority, the resolution of the issue of whether the complaint is sufficient is a pure question of law upon which this court can pass.

We find the *Thomas* case, *supra*, dispositive of the issue of whether the State is entitled to indemnity from Amoco. In that case the court stated, in 346 N.E.2d at 259:

"The State's 'implied in law' indemnity theory can be disposed of quickly. It is the law of this State that one is not entitled to be indemnified against his own negligence in the absence of a contract to that effect. [Citations omitted].

\*   \*   \*   \*   \*   \*

We have recently reiterated the applicable guidelines for resolution of a claim for indemnification by an indemnitee, based on a contract, for the indemnitee's own negligence:

'Contracts which provide indemnification for one's own negligence may if "knowingly and willingly" made, be valid and enforceable in Indiana. *Loper v. Standard Oil Co.* (1965), 138 Ind. App. 84, 211 N.E.2d 797; *Weaver v. American Oil Co.* (1972), 257 Ind. 458, 276 N.E.2d 144. However, such provisions are strictly construed and will not be held to provide indemnity unless so expressed in "clear and unequivocal" terms. *Norkus v. General Motors Corp.* (S.D.Ind.1963), 218 F.Supp. 398, 399. *Vernon Fire & Casualty Ins. Co. v. Graham* (2d Dist. 1975), Ind.App., 336 N.E.2d 829, 831.'

Hence the precise issue is whether the terms of . . . the parties' contract *cleary* and *unequivocally* manifest a commitment . . . knowingly and willing [sic] made, to pay for damages occasioned by the State's [indemnitee's] negligence." (Emphasis in the original.)

█ In the case at bar, the clause purporting to impose indemnification upon Amoco reads as follows:

"(n) The permittee [Amoco] shall assume all responsibility for any injury or damage to persons or property resulting directly or indirectly from the construction of any approach or driveway."

This provision contains no mention of the indemnification of the State by Amoco in case of the State's own negligence. Further, under the standards of the *Thomas* case, this provision is simply too vague to impose the burden of indemnification upon Amoco for negligent acts of the State. Thus the trial court did not err in sustaining Amoco's motion to dismiss.

The trial court is in all things affirmed.

Affirmed.

LOWDERMILK and ROBERTSON, JJ., concur.