**INDIANA & MICHIGAN ELECTRIC COMPANY, An Indiana Corporation, and Indiana Franklin Realty, Inc., An Indiana Corporation, Defendants-Appellants**

v.

**Emma HARLAN, Plaintiff-Appellee.**

**No. 1–1285A324.**

Court of Appeals of Indiana, First District.

Feb. 24, 1987.
Rehearing Denied April 7, 1987.

Thomas W. Yoder, C. Erik Chickedantz, Livingston, Dildine, Haynie & Yoder, Fort Wayne, John L. Asbury, Rockville, for defendants-appellants.

Max E. Goodwin, Mann, Chaney, Johnson, Goodwin & Williams, Terre Haute, Hanner, Hanner & Hanner, Rockville, for plaintiff-appellee.

NEAL, Judge.

### STATEMENT OF THE CASE

Defendant-appellants, Indiana & Michigan Electric Company (I & M) and Indiana Franklin Realty, Inc. (IFR), appeal a judgment, rendered by the Parke Circuit Court without a jury, ordering I & M and IFR to reconvey real estate acquired from plaintiff-appellee, Emma Harlan (Emma), by fraud, and assessing punitive damages.

We affirm.

### STATEMENT OF THE FACTS

In special findings of fact and conclusions of law requested by I & M and IFR, the trial court made the following findings, summarized by us. Emma and her husband, James, owned 60 acres of land in Prairie Creek Township, Vigo County, Indiana, located 3½ miles north of I & M's Breed generating plant in Sullivan County, Indiana. I & M and IFR are wholly owned subsidiaries of American Electric Power Company, Inc. (AEP). I & M, an electric utility, has the right to exercise the power of eminent domain. IFR is a real-estate holding company AEP uses to acquire property not presently needed for utility pur-

poses, but which may be needed for utility purposes in the future.

The remainder of the findings, conclusions, and judgment are set out verbatim as follows:

"3. About December 1972, real estate agent Max Miller, acting for I & M and [IFR], contacted James and Emma Harlan at their home to attempt to acquire their property on behalf of [I & M and IFR]. After several discussions with Harlans, they signed, in February 1973, an option for [IFR] to purchase the above-mentioned 40 and 20 acre parcels and another 80 acre parcel. Subsequently, in May 1973, Miller delivered to Harlans, [IFR's] notice of intention to exercise the option, and in October 1973, they signed a deed, prepared by I & M, conveying the 40 acre and 20 acre parcels to [IFR] for $600 per acre.

4. At all times that Miller called on the Harlans until they signed the deed, [I & M] had not adopted any definite plan for the use of the Harlan property for electric generating facilities. [I & M and IFR] apparently wish to acquire many acres in northern Sullivan and southern Vigo Counties, to be held for possible use at some future date. There were no approved drawings for the use of the Harlan property for any specific purpose. Because of the distance of the real estate from the existing Breed Plant it would appear it would be needed only if four or more generating units were constructed at the Breed Plant. There were no plans for the construction of such unit. [I & M and IFR] and their agents would not disclose these facts to the owners of the real estate.

5. Agent Miller told Harlans I & M had definitely decided to construct additional generating facilities in the vicinity of the Breed plant in the near future, and that it was necessary for [I & M and IFR] to acquire property from Harlans for a reservoir to be constructed as part of such facilities. [I & M and IFR] further represented to Harlans that it would be necessary for I & M to acquire the property through the power of eminent

domain if Harlans did not voluntarily sell it.

6. [I & M and IFR] concealed from Harlans the fact that [IFR] was a real estate holding company whose purpose in the AEP System was to hold land which was not immediately needed for utility purposes and might never be needed for utility purposes.

7. Because of the misrepresentation and concealment of the above material facts, Harlans believed they had no real freedom to choose whether to keep or convey their property. They reasonably believed that they would be sued if they did not sell to [I & M and IFR] 'voluntarily', that they would lose their property anyway, and that because of litigation expenses and fees, they would be worse off than if they conveyed by deed.

8. In reliance on [I & M and IFR's] false representations, and because the true facts were concealed, Emma and James Harlan signed the option, and later signed the deed conveying 60 acres to [IFR].

9. In April 1974, after acquiring the Harlan property, I & M publicly announced it would expand the Breed plant by building two 1300 megawatt generating units at the Breed site. A few weeks later, I & M announced the project, known as Project 2601, had been indefinitely postponed. By March 1975, that project had been cancelled entirely. In any event, assuming I & M did briefly intend to build two additional units at Breed, there are no approved design drawings or other records showing that the Harlan property would have been used for that project. On the contrary, the public announcement of the project stated it would be on a 6300 acre site, which would not logically have encompassed the Harlan property in Vigo County, which was part of more than 9000 acres acquired by [I & M and IFR] in Sullivan and Vigo Counties.

10. Since cancellation of 'Project 2601', [I & M] has had no other approved drawings on any specific plan for expansion of the Breed plant.

11. The Harlan property has never, at any time, been used by [I & M] for any public purpose. [IFR] deeded the property to I & M in 1975, and I & M has continued to lease the 40 acre parcel for farming each year and has received the income from the property.

12. I & M now has no definable plan to add generating facilities at Breed or any other location any time in this century, except for the two 1300 megawatt units now under construction at Rockport.

13. I & M has no present or reasonably forseeable need to use the Harlan property for a proper public utility purpose.

14. [I & M and IFR] have not revealed to the public the fact that I & M has no definite plans for the use of the thousands of acres of real estate which it acquired in the vicinity of the Breed Plant in Sullivan and Vigo Counties including the Harlan property. In this litigation [I & M and IFR] have admitted that there is no likelihood of using the real estate for utility purposes in the next twenty years.

15. [I & M and IFR's] use of the threat of eminent domain to acquire Harlans' property for remote or speculative purposes, their concealment of the lack of any commitment to use the land for a public purpose, and their determination to continue to hold land taken under the threat of eminent domain when no public use is contemplated in this century, has been in reckless disregard of the rights of Indiana citizens, including Emma Harlan, and has been willful, malicious and oppressive.

16. [I & M and IFR] acted together throughout the transactions described above.

17. The facts set forth in each of the above findings have been shown by clear and convincing evidence.

18. James Harlan is now deceased, and Emma Harlan has succeeded to his interest in the 60 acres.

19. [Emma] suffered actual injury from [I & M and IFR's] fraudulent conduct in acquiring and retaining her property. Real estate, which by its nature is

unique, and which [Emma] did not wish to sell, was taken from her by [I & M and IFR]. After obtaining the deed to the property, [I & M and IFR] rented the cropland back to Harlans for a year or two, but did not honor their written agreement to rent the ground back to Harlans for the nominal sum of $100.00 per year. Then after she suspected she had been defrauded, [Emma], personally and by her retained attorneys, was required to spend a great amount of time and effort because of [I & M and IFR's] conduct, including investigation and research of the relevant facts, legal research, and pursuit of this litigation and its attendant consumption of time and expense, before and at trial. The dollar amount of the actual injury to [Emma] is obviously substantial, but the evidence does not disclose a dollar amount, for which reason the Court determines that compensatory damages of $1.00 should be awarded to [Emma].

20. The public interest requires an award of punitive damages sufficient to punish [I & M and IFR] for their fraudulent, willful, malicious, oppressive and reckless conduct, as shown by the clear and convincing evidence, and to deter them from such conduct in the future.

### CONCLUSIONS OF LAW

1. The law is with the plaintiff, Emma Harlan, and against [I & M and IFR].

2. [I & M and IFR] have acquired and held the Harlan property through fraud.

3. [I & M and IFR] can only hold the deed to the Harlan property in constructive trust for the grantors. Emma Harlan having succeeded to the interest of James Harlan in the property, it is held in constructive trust for her.

4. Judgment for compensatory and punitive damages should be entered against [I & M and IFR] jointly.

### JUDGMENT

[I & M and IFR] are hereby ordered to convey to Emma Harlan the 40 acre parcel and the 20 acre parcel which Harlans conveyed to [IFR].

The Court hereby assesses compensatory damages in the amount of One Dollar ($1.00) and punitive damages in the amount of Fifty Thousand Dollars ($50,000.00) against [I & M and IFR], jointly, and in favor of [Emma]....."

*Record,* vol. IV at 409–13.

### ISSUES

I & M and IFR present approximately 50 arguments and subarguments in which they attack each and every finding and conclusion entered by the trial court. Twenty-eight of those arguments claim that the various findings either are not supported by the evidence or are contrary to the evidence. We shall restate the issues as follows:

I. Sufficiency of the evidence.

Point I, argument A(i), (ii), (iii), (iv) and (v) all attack Finding 4; (vi) attacks Finding 5; (vii) attacks Finding 6.

Point I, argument C(i) and (ii) attacks Finding 7; (iii) attacks Finding 8.

Point I, argument D(i), (ii) and (iii) attack Finding 9; (iv) attacks Finding 10; (v) attacks Finding 12; (vi) attacks Finding 13; (vii) and (viii) attack Finding 14.

Point VI, argument A(i), (ii), (iii) and (iv) attack Finding 19.

Point VI, argument B(i), (ii), (iii) and (iv) attack Finding 15.

II. The trial court erred in finding that fraud can be predicated upon statements of future intentions.

III. The trial court erred in finding that fraud can be predicated upon the opinion of I & M and IFR's agent.

IV. The trial court erred in applying eminent domain "necessity" standards.

V. The trial court erred in holding that I & M could not alter its plan.

VI. The trial court erred in imposing a constructive trust.

VII. The trial court erred in refusing to make findings on affirmative defenses of laches, statute of limitations, and estoppel.

VIII. No actual damages were shown.

IX. The trial court erred in assessing punitive damages.

X. The trial court erred in ordering restitution.

## DISCUSSION AND DECISION

### ISSUE I:

■ I & M and IFR's approach to this series of issues is to boldly assert that each of the mentioned findings, or a part thereof, either was not supported by the evidence or was contrary to the evidence, and then they argue the evidence most favorable to themselves. Suffice it to say, in the disposition of these issues, we have examined the record and find that the challenged findings were supported by the evidence and were not contrary to it. We remind I & M and IFR of the standard of appellate review, as was stated in *Walters v. Dean* (1986), Ind.App., 497 N.E.2d 247, 254:

> "[W]e neither weigh the evidence nor judge credibility of witnesses. Rather, we examine only that evidence and reasonable inferences which support the trial court's decision. *State v. Thompson* (1979), 179 Ind.App. 227, 385 N.E.2d 198, *trans. denied.* In a case tried to the court without a jury we will not reverse unless the decision is clearly erroneous. Ind.Rules of Procedure, Trial Rule 52(A); *Stubbs v. Hook* (1984), Ind.App., 467 N.E.2d 29, *trans. denied; Hurt v. Polak* (1979), Ind.App., 397 N.E.2d 1051. The judgment of a trial court will be found to be clearly erroneous only when upon our review of all the evidence we are left with a firm conviction that a mistake has been made. *University Casework Systems, Inc. v. Bahre* (1977), 172 Ind.App. 624, 362 N.E.2d 155, *trans. denied.* The judgment of the trial court must be upheld if it can be sustained upon any legal theory which the evidence supports. *Hurt, supra* at 1053."

### ISSUES II through X:

The theory of Emma's case, as reflected by the pleadings and found by the trial court, is that I & M and IFR fraudulently represented a present need for the real estate for public utility purposes when, in fact, they were acquiring the property for remote and speculative purposes. I & M and IFR further fraudulently intimidated the Harlans with the threat of eminent domain (which, under the facts and circumstances, they had no right to use) if the Harlans did not accede to their demands. The relief sought by Emma was rescission, compensatory damages, and punitive damages.

■ Before a utility may exercise its right of eminent domain, there must be a present necessity. *Meyer v. NIPSCO* (1970), 254 Ind. 112, 258 N.E.2d 57. While a utility may condemn property for future use, the future use must be fairly and reasonably needed. *I & M Electric Co. v. Schnuck* (1973), 260 Ind. 632, 298 N.E.2d 436. A utility may not maintain an action of condemnation for purely speculative future needs. *Id.* In *Meyer, supra,* the court rejected condemnation for a use six to ten years in the future. The purpose of the rule is to prevent abuse of the power by making appropriations for speculative, monopolistic, or other purposes, foreign to the legitimate objects contemplated by the condemning corporation's charter. *Country Estates, Inc. v. NIPSCO* (1970), 254 Ind. 108, 258 N.E.2d 54.

■ Thus, representations by I & M and IFR's agent of a present need, and the threat to use eminent domain to acquire the Harlans' property, were patently false and fraudulent. Such were misrepresentations of present facts, and not statements of future intentions. The status of the plans was known only to I & M and IFR, and not to the Harlans or their attorney. That, too, is fact, not opinion, as I & M and IFR argue. The Harlans relied upon those misrepresentations and sold property they had no intention of selling. Such acts were not voluntary, as also argued by I & M and IFR.

■ Fraud in the inducement of a contract is a basis for rescission. *Shuee v. Gedert* (1979), 182 Ind.App. 432, 395 N.E.2d 804; *Grissom v. Moran* (1972), 154 Ind.App. 419, 290 N.E.2d 119, *reh. denied* (1973), 154 Ind.App. 419, 292 N.E.2d 627.

Generally, a party bringing an action for fraud has an election between two remedies: he may affirm the contract, retain the benefits, and seek damages; or he may rescind the contract, return any benefits received, and be returned to the status quo. If he elects to rescind the contract he may not recover general damages, but is only entitled to be returned to the status quo, which usually necessitates a return of money or other things received or paid under the contract, plus reimbursement as special damages, for any reasonable expenditure incurred as a proximate result of the fraudulent conduct. However, the rescinding party must restore all benefits received under the contract. *Smeekens v. Bertrand* (1974), 262 Ind. 50, 311 N.E.2d 431, *Shuee, supra; Grissom, supra;* 14 *I.L.E. Fraud* sec. 41 (1959).

▆▆▆ Punitive damages may be awarded for fraud. Generally, an award for compensatory damages is a prerequisite to an award for punitive damages; however, the granting of affirmative equitable relief will support an award of punitive damages. *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, *trans. denied.*

Emma proceeded upon the theory of rescission in her complaint, and offered to offset against any damages to which she was entitled the sum of $36,179.00, which the Harlans had received for the property. Under the law and the facts as found by the trial court, Emma would, under a rescission theory, be entitled to the return of her property, but would be required to restore to I & M and IFR the purchase price. Emma would be entitled to reimbursement for reasonable expenses, but she would not be entitled to general damages. Punitive damages could also be awarded. In its judgment, the trial court ordered reconveyance without ordering the restoration of the purchase price. On the face of the judgment there was error, which was argued in the motion to correct error. In its ruling on the motion to correct error, the trial court stated:

"[I & M and IFR] have contended, among other things, that the Court could not enter a judgment ordering reconveyance of the real estate to [Emma] without at the same time ordering [Emma] to refund the $36,179.00 which [Emma] received for the conveyance, plus interest. In determining the amount of punitive damages to be awarded and in entering judgment, the Court carefully considered these matters. The judgment entered by the Court is intended to return the real estate to its rightful owner at a net cost to [I & M and IFR] sufficient to deter them from similar conduct in acquiring real estate in the future.

The Court determined that a net cost to [I & M and IFR] of the price paid for the land plus $50,000.00 would be the minimum amount which might achieve the required deterrent effect. Instead of ordering [Emma] to pay [I & M and IFR] $36,179.00 in return for reconveyance of the land and assessing punitive damages of $86,000.00 or more, the judgment was entered in a form which would have the same net effect on the parties. There are substantial reasons to believe that the net cost of this judgment to [I & M and IFR] might be insufficient to deter them from similar conduct in the future. Anything less would have no deterrent effect at all. [Emma] could not be appropriately ordered to repay the purchase price without increasing the punitive damage award appropriately."

*Record,* vol. IV at 491–2.

The judgment of the trial court should be upheld if it is sustainable on any theory. *Flynn v. Barker* (1983), Ind.App., 450 N.E.2d 1008, *cert. denied,* 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984). Two bases are present here to sustain the judgment; one is construction of the judgment, and the other is modification of the judgment by the trial court in its ruling on the motion to correct error.

▆▆▆ A judgment is construed in the same manner as a contract would be. The language of a judgment is ambiguous when it would lead two reasonable persons to different conclusions as to its effect and meaning. When construing the language of a judgment, the reviewing court will attempt to read all of the provisions of a

judgment so as to render them all effective. *Flynn, supra.* In the construction of a judgment, the reviewing court may look at the entire record, including but not limited to the complaint, findings, argument, and evidence, to ascertain the meaning and effect of the judgment. *State ex rel. Booth v. Beck Jewelry Enterprises, Inc.* (1942), 220 Ind. 276, 41 N.E.2d 622; *Cleavenger, Admr. v. Rueth* (1962), 134 Ind.App. 18, 185 N.E.2d 305.

■ A trial court may correct a judgment to make the judgment conform to the intent of the trial court in the original entry of the judgment. *Flynn, supra.* Such is not an abuse of discretion, even where the petition to amend was filed four months after the entry of a judgment and the trial court amended the judgment to correct an ambiguous omission. *Lankenau v. Lankenau* (1977), 174 Ind.App. 45, 365 N.E.2d 1241. Under Ind.Rules of Procedure, Trial Rule 59(J)(3) and (4), the trial court, in ruling on the motion to correct error, may:

"(3) alter, amend, modify or correct judgment;

(4) amend or correct the findings or judgment as provided in Rule 52(B)."

■ Ind.Rules of Procedure, Trial Rule 52(B), permits the trial court, upon its own motion or with or as part of the motion to correct error, to open the judgment or amend or make new findings and enter a new judgment, or any combination thereof. Thus, ample authority exists which permits a trial court, at least up to and including the ruling on the motion to correct error, to alter, amend or modify its judgment without limitation. It is perfectly clear from the complaint, the judgment, the theory of the case, and the ruling on the motion to correct error, that the intent of the trial court, in entering the judgment, was that Emma was to receive punitive damages based on equitable relief in the amount of $86,179.00, against which was offset the purchase price of $36,179.00. That result can still be reached, whether we denominate the method by which we arrived at it as construction of the judgment, or modification of the original judgment by the ruling on the motion to correct error.

I & M and IFR additionally argue that the trial court erred in holding them to eminent domain "necessity" standards because the Harlans' conveyance was voluntary. We perceive that the basis of the action is a blatant misrepresentation of a present existing need, the result of which I & M acquired property it otherwise could not get. Whether its motive was speculation of land values, or to put the property into the rate base, the evidence does not show. In any event, I & M represented a staus that did not exist. Likewise, I & M and IFR argue that the trial court erred in holding that I & M could not alter its plan. The obvious basis of the ruling is that I & M had no plan to alter, only a possibility.

I & M and IFR finally claim the trial court erred in not making findings on their affirmative defenses of laches, statute of limitations, and estoppel. Our examination of the record reveals that they were not entitled to favorable findings on those issues. Again, I & M and IFR request us to reweigh the evidence and substitute our judgment for that of the trial court.

For all the above reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON, J., concurs.

RATLIFF, C.J., concurs with opinion.

RATLIFF, Chief Judge, concurring.

The majority opinion twice states that the judgment of the trial court must be upheld if it can be sustained upon any legal theory which the evidence supports. At 306 and 308. While this is indeed the rule in cases involving a general finding and judgment *Shrum v. Dalton* (1982), Ind.App., 442 N.E.2d 366, such is not the rule where the judgment is based upon special findings of fact made and entered pursuant to Ind.Rules of Procedure, Trial Rule 52. Where special findings are entered, the appellate tribunal may not affirm the trial court's judgment on any ground which the evidence supports, but must determine if the specific findings are adequate to support the trial court's decision.

*Orkin Exterminating Company, Inc. v. Walters* (1984), Ind.App., 466 N.E.2d 55; *Shrum*, 442 N.E.2d at 372.

In this case, I find the trial court's special findings sufficient to sustain its judgment. Therefore, I concur.