**WYMBERLEY SANITARY WORKS,**
**Appellant–Petitioner,**

v.

**Earl L. BATLINER, Jr., Thomas L. Cairns, Betty Jane Cairns, Edward Balmer, Jr., Rosemary Balmer, Daniel Frank Danzl, and Joanna Danzl, Appellees–Respondents.**

No. 22A01–0802–CV–55.

Court of Appeals of Indiana.

April 14, 2009.

Jon Laramore, Fred E. Schlegel, Clayton C. Miller, Baker & Daniels LLP, Indianapolis, IN, Attorneys for Appellant.

Wayne C. Turner, Shannon D. Landreth, Bingham McHale LLP, Indianapolis, IN, Attorneys for Amicus Curiae Indiana Energy Association.

David T. McGimpsey, Bingham McHale LLP, Indianapolis, IN, Attorney for Amicus Curiae Indiana Association of Sewer Companies, Inc.

Bryan H. Babb, Bose McKinney & Evans LLP, Yasmin L. Stump, Law Office of Yasmin L. Stump, Indianapolis, IN, Attorneys for Appellees.

Stephen J. Peters, Rory O'Bryan, David I. Rubin, Harrison & Moberly, LLP, Indianapolis, IN, Scott Bullock, Arlington, VA, James S. Thompson, New York, NY, Attorneys for Amicus Curiae Institute for Justice.

Sara J. MacLaughlin, Mark J. Thornburg, Justin T. Schneider, Indianapolis, IN, Attorneys for Amicus Curiae Indiana Agricultural Law Foundation, Inc.

## OPINION

BAKER, Chief Judge.

Here, we are asked to consider the common arrangement between a utility company and a property developer in which the developer finances the extension of a sewer line to a proposed housing development. We find that such an arrangement is permissible and that the utility is entitled to

exercise the power of eminent domain to effect the sewer line extension.

Appellant-petitioner Wymberley Sanitary Works (Wymberley) appeals the trial court's orders dismissing Wymberley's eminent domain complaints against the appellees-respondents (collectively, the Landowners) and granting the Landowners' motions for attorney fees in the amount of $83,042.14. Wymberley argues that the trial court should have concluded that Wymberley's proposed takings are for a public purpose, that there is a current need for the takings, that Wymberley's proposed sewer route was not arbitrary or capricious, and that attorney fees are not warranted because Wymberley did not act in bad faith. The Landowners cross-appeal, arguing that the trial court erred by denying them their attorney fees incurred in preparing and defending the fee petitions.

Finding that the trial court erred as a matter of law when it concluded that Wymberley made improper offers to purchase the requested easements, that the proposed takings are not for a public use, that there is no current need for the takings, that Wymberley acted in bad faith, and that the Landowners are entitled to a portion of their requested fees, and finding that the trial court properly denied the Landowners' some of their requested fees, we affirm in part, reverse in part, and remand with instructions to enter final judgment in Wymberley's favor.

## FACTS [1]

Wymberley does business as Aqua Indiana and is a public utility, meaning that it has the right to exercise the power of eminent domain for public use. Sometime in 2004, a developer, Robert Lynn Company, Inc. (Lynn), approached Wymberley and asked that Wymberley extend sewer service to its proposed subdivisions known as Lafayette Ridge and Lafayette Landings (the Lynn Developments). At that time, Wymberley's Certificate of Territorial Authority (CTA) did not include the location of the proposed Lynn Developments.

Therefore, on December 16, 2004, Wymberley filed a verified application for an expanded CTA with the Indiana Utility Regulatory Commission (IURC). On April 28, 2005, the IURC approved the expansion of Wymberley's CTA to serve the proposed Lynn Developments and ordered Floyd County to allow Wymberley to use existing public rights-of-way for the sewer line extension. Wymberley obtained the new CTA on May 4, 2005.

On April 7, 2005, Lynn and Wymberley entered into an agreement (the Agreement) providing for the extension of the sewer lines from Wymberley's sewage treatment plant to the proposed Lynn Developments. Pursuant to the Agreement, Lynn would attempt to acquire the easements for the sewer line extension and would pay all costs associated with determining the route for the sewer line extension, including acquisition of the easements, engineering and appraisal costs, construction costs, and litigation costs if eminent domain proceedings were filed. It is a common practice for water and sewer utilities to contract with developers in arrangements pursuant to which the developers pay for the extension of service to new subdivisions. By requiring developers to bear these costs, the utility's current customers are relieved of the costs of expanding the system to serve new customers.

1. We held oral argument on this case on March 11, 2009, in Indianapolis. We thank counsel and amici for their able attention to this matter.

Lynn hired Paul Primavera and Associates (Primavera), an engineering firm, to design the route for the sewer line extension. The route recommended by Primavera (the Primavera Route) crosses the respective properties of appellees-respondents Earl L. Batliner, Jr., Thomas L. and Betty Jean Cairns, Edward and Rosemary Balmer, and Daniel Frank and Joanna Danzl. The route uses a minimal amount of existing public rights-of-way, would serve only two to three properties other than the Lynn Developments, and is the shortest route from the sewage plant to the Lynn Developments. *Id.* at 17. Wymberley ultimately approved the Primavera Route.

The Landowners hired Albert Goodman, an environmental engineer, to prepare reports about alternatives to the Primavera Route. Goodman offered a number of alternative routes, one of which would exclusively use public rights-of-way and another of which runs nearly parallel to the Primavera Route.

At trial, the Landowners argued that the Primavera Route will have a detrimental environmental impact on the topography of the route location. At oral argument, however, Wymberley assured the court that environmental concerns would be taken into account during the permitting process by the agency charged with analyzing such factors—the Indiana Department of Environmental Management. The permitting process does not begin until after the taking is finalized.

Sometime in 2005, Lynn's president approached Joanna Danzl and informed her that Lynn wanted to purchase easements across her property for the sewer line extension. Lynn offered the Danzls $5,783 and encouraged the Danzls to accept the offer. On August 5, 2005, Lynn sent letters to the Landowners, again offering to purchase easements from them for the sewer line extension, cautioning them that if they did not accept, Wymberley would bring eminent domain actions against them. On February 22, 2006, Wymberley sent letters to the Landowners, offering to purchase the easements.

On May 15 and July 17, 2006, the Plan Commission approved the Lynn Developments. The approval was contingent upon extension of sanitary sewer service to the proposed Lynn Developments. On September 17, 2007, the Plan Commission revoked its preliminary plat approvals. Subsequently, an injunction was issued restraining the Plan Commission from withdrawing its prior approval pending the resolution of this litigation.

On July 28, 2006, Wymberley filed four respective eminent domain complaints against the Landowners. On April 16, 2007, the trial court consolidated the four cases for a bench trial, which took place on June 26 and August 23, 2007. The parties filed proposed findings of fact and conclusions of law, and on December 27, 2007, the trial court issued its order dismissing the complaint and ordering Wymberley to pay the Landowners' attorney fees. In relevant part, the trial court held as follows:

6. A utility company must demonstrate an immediate or present need for private property that it seeks to take through its exercise of the power of eminent domain.

7. Additionally, a utility company may not take private property through the power of eminent domain for "speculative, monopolistic, or other purposes foreign to the legitimate objects contemplated by the corporation's charter."

8. Wymberley has failed [ ] to show an immediate and present need for the real estate interests it seeks to take from the Landowners in these con-

solidated cases. The proposed Lynn development is not in existence, no time frame exists for when it will be developed, and the number of lots that may be developed is speculative.

9. A condemning authority's taking is not necessary if it is fraudulent or in bad faith.

\* \* \*

11. Wymberley's taking of easements from the Landowners in this consolidated case is in bad faith because Wymberley promised the IURC that it would use the existing public right-of-way in extending its sewer lines and its proposed route uses only a minimal amount of existing public right-of-way.

12. Wymberley's taking of easements from the Landowners in this consolidated case is also in bad faith because Wymberley promised the IURC that it would provide service to as many customers as possible. Its plan, as shown by the evidence, is to serve "a" single customer, Lynn, and the route only allows possibly two (2) to three (3) other property owners to connect to the sewer line for service....

\* \* \*

14. Wymberley's proposed takings ... are in bad faith because the Floyd Plan Commission requires that Lynn voluntarily obtain the easements needed rather than Wymberley exercising the power of eminent domain to take the easements from the Landowners.

\* \* \*

21. Wymberley's selection of the route for extension of its sewer lines to the proposed Lynn Development is "arbitrary and capricious." It merely approved a single route selected and submitted exclusively by Lynn, who has a vested, financial interest in selecting the least expensive route and not a route that will best serve the public.

22. Wymberley failed to: a) physically inspect the properties from which it proposes to take easements, which would have allowed it to inspect and analyze the topography of the Landowners' property ...; b) develop, consider or analyze any alternative routes ...; c) consider the environmental impact of the proposed route on the properties affected by the route; d) obtain any input from the Landowners about the proposed route; or e) have an independent engineer review and consider the proposed route.

23. The proposed taking by eminent domain would work an unreasonable and irreparable harm and damage to the Landowners' property when other alternatives are reasonably known, and available, to Wymberley.

24. A condemning authority's proposed taking is improper if it is a subterfuge for a private use.

\* \* \*

28. Wymberley's proposed takings in these consolidated cases are exclusively for the benefit of one, single individual, Lynn.

\* \* \*

31. Lynn has acted as Wymberley's agent in taking the Landowners'

property interests through the exercise of eminent domain.

32. Initially, Lynn, not Wymberley, made offers to the Landowners[ ] to purchase easements from them. Lynn, not Wymberley, initially threatened the Landowners with the exercise of eminent domain if they did not accept his [sic] offers.

33. Lynn, through its engineer, selected effectively one (1) route for extension of the sewer line to service its proposed development.

34. The route that Lynn selected is the shortest and least expensive route.

35. Lynn has a vested, financial interest in the route because it will be paying for all costs associated with the extension of the sewer line . . . .

\* \* \*

37. Lynn, a private entity, is paying to use Wymberley's right to exercise the power of eminent domain for Lynn's financial gain, which is a private use, and, as such[,] an abuse[ ] of the exercise of the power of eminent domain.

\* \* \*

42. Wymberley failed to make a good faith effort to purchase the Landowners' property interests because, prior to filing its eminent domain complaints, it failed to provide any of the Landowners with copies of the . . . appraisals upon which its offers to the Landowners are based.

Appellant's App. p. 27–34 (emphases and internal citations omitted).

On January 23, 2008, Wymberley filed its notice of appeal. On January 25, 2008, the Danzls and the Balmers moved for reimbursement of their attorney and engineering fees. On February 19, 2008, the Cairnses moved for recovery of their attorney fees and costs. The Landowners argued that the trial court's findings of bad faith justified an award of fees and costs. Wymberley disputed the trial court's bad faith findings and argued that those findings would be at issue in the pending appeal. On March 7, 2008, Wymberley moved for partial relief from judgment pursuant to Indiana Trial Rule 60(B). On March 28, 2008, this court stayed the appeal and remanded jurisdiction back to the trial court for the purpose of addressing the pending motions.

Following a hearing, the trial court granted the Landowners' fee motions on April 15, 2008, and set a hearing to determine the amount of fees owed. In a separate order, the trial court denied Wymberley's motion for partial relief from judgment. On May 5, 2008, Wymberley waived its right to a hearing to contest the reasonableness of the fees that the Landowners were seeking. On June 27, 2008, the trial court ordered Wymberley to pay the Cairnses' fees and costs in the amount of $28,108.30 and to pay the Danzls' and Balmers' collective fees and costs in the amount of $83,042.14. The trial court also ordered Wymberley to post an appeal bond in that amount plus $20,000 for anticipated appellate attorney fees. On July 27, 2008, this court resumed jurisdiction over this appeal. Wymberley now appeals the judgment and fee awards and the Landowners cross-appeal the portion of the fee awards in which the trial court denied their request for attorney fees incurred to prepare and defend the fee petitions.

## DISCUSSION AND DECISION

### I. Standard of Review

The trial court entered findings of fact and conclusions of law pursuant to Indiana

Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind. 2000). First, we consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard,* 726 N.E.2d at 1210.

In conducting our review, we give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind. 1999).

## II. Eminent Domain

■ It is undisputed that Wymberley is a public utility that has the right to exercise the power of eminent domain pursuant to Indiana Code section 8–1–8–1. To exercise this power, the condemning authority must establish, among other things, that it made the statutorily required offer to purchase the property interest, Ind.Code § 32–24–1–3(b)(2), that the proposed taking is needed for a public purpose, I.C. § 32–24–1–3(a), and that there is a current need for the taking, *Ind. & Mich. Elec. Co. v. Harlan,* 504 N.E.2d 301, 306 (Ind.Ct. App.1987). Wymberley argues that the trial court erred by concluding that it failed to meet all of these tests. Additionally, Wymberley contends that the trial court erred by concluding that its route selection was arbitrary and capricious and that it acted in bad faith.

### A. Offer to Purchase

■ Among other things, the condemning authority must make an effort to purchase the necessary property interest from the landowner. On February 22, 2006, when Wymberley sent its written offers to the Landowners, the statute then in effect required only that the utility make an effort to purchase the property interest. I.C. § 32–24–1–3 (2002).

Since that time, the General Assembly has amended the statute, which now requires, among other things, that the effort to purchase include "providing the owner of the property with an appraisal or other evidence used to establish the proposed purchase price." I.C. § 32–24–1–3(c) (2009). The trial court evidently applied the current statute rather than the one that was in effect at the time Wymberley sent its offers to the Landowners in concluding that "Wymberley failed to make a good faith effort to purchase the Landowners' property interests because, prior to filing its eminent domain complaints, it failed to provide any of the Landowners with copies of the ... appraisals upon which its offers to the Landowners are based." Appellant's App. p. 33–34.

We cannot agree. At the time when Wymberley sent its written offers to the Landowners, the only prerequisite was that the condemning authority make an offer to purchase the property in the form prescribed by another section of the statute. I.C. § 32–24–1–5(c) (2002). Wymberley complied with that requirement. The version of the statute applied by the trial court did not become effective until March 24, 2006, and contains no indication that it was intended to be retroactive. Under these circumstances, we find that the trial court erred by concluding that

Wymberley failed to make a proper offer to purchase the Landowners' respective property interests.

### B. Public Use

The power of eminent domain may be exercised only for public use. I.C. § 32–24–1–3(a); *Bd. of Comm'rs of Vanderburgh County v. Joeckel,* 407 N.E.2d 274, 278 (Ind.Ct.App.1980). A condemning authority's proposed taking is improper if it is merely a subterfuge for a private use. *Michael v. City of Bloomington,* 804 N.E.2d 1225, 1231 (Ind.Ct.App.2004).

Wymberley points out that "Indiana courts have long recognized the public nature of utility service, even when provided by a for-profit business." Appellant's App. p. 20. Here, it is evident that the sewer line extension will benefit the public, including those who will live in the subdivisions and the public at large, "which will enjoy the public health and environmental benefits from proper disposal of sewage." *Id.* The mere fact that the sewer line extension will enhance the value of the subdivision to the developer does not alter the fact that there is a public benefit as well.

Additionally, we observe that the undisputed evidence in the record is that it is common practice for water and sewer utilities to contract with developers pursuant to arrangements in which the developers pay for the extension of service to new subdivisions. Indeed, the Landowners' expert recognized this at trial and the Landowners' attorney conceded as much at oral argument. To prohibit this practice would, in essence, require utilities to change their business model, and we are neither prepared nor required to take such a step.

The Landowners disagree with this framing of the issue, pointing out that no prior case has considered whether a private enterprise can buy or rent a utility's eminent domain power. We simply cannot conclude that such a transaction occurred here. Lynn did not exercise the eminent domain power; Wymberley did. Lynn did the research, the planning, and the legwork, but Wymberley made the ultimate decision to engage in the taking and Wymberley, rather than Lynn, has litigated this lawsuit. As noted above, this type of arrangement is very common, and we see nothing herein that distinguishes this situation from the norm.

The Landowners also argue that Lynn made decisions based on its bottom line rather than enhancing the public good. Initially, we observe that Lynn's bottom line is not necessarily adverse to the public good. Furthermore, as will be explored more fully below, although there were other available routes that would have used public rights of way, the route that Lynn and Wymberley selected was very similar to one of the alternative routes plotted by the Landowners' own expert. Under these circumstances, the fact that Lynn may have considered its own bottom line does not alter our conclusion that Wymberley seeks to exercise its power of eminent domain for public use.

Caselaw supports this position. In *Kelo v. City of New London,* the United States Supreme Court found that a municipal taking was for a public purpose even though the property that was taken was to be transferred to the hands of another private owner. 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). It is apparent that the instant case does not even go that far, inasmuch as Wymberley's taking would not transfer the property to a private entity but to a regulated public utility that provides a public service.

Wymberley also directs our attention to our Supreme Court's opinion in *Westport Stone Co. v. Thomas,* 175 Ind. 319, 94 N.E.

406 (1911). In considering Westport Stone Company's request to condemn an easement for a railroad extension between two quarries, our Supreme Court found that the intersection of private and public interest does not necessarily remove the public purpose from the equation:

> ... The fact that the construction of such lateral railroad may or will subserve a private interest does not change the character of the use from a public use to a private one. As has been said: "The mere fact that the primary purpose of lateral railroad is to accommodate a particular private enterprise is not a controlling test. The character of the use, whether public or private, is to be determined by the extent of the right of the public to use it, and not by the extent to which the right is or will be used."

> It is not a question whether appellant is a private or public corporation, but whether the use is a public one. If it is to be so used, the right of condemnation can be bestowed upon any private corporation; but if not to be so used it cannot be conferred upon either a private or a public corporation.

*Id.* at 408 (quoting 15 Cyc. 590) (internal citations omitted).

*Westport* establishes that, at the least, we should focus on the use to which the property will be put in addition to the mechanics of the taking. Here, the easement "will be used for utility service to homeowners—likely hundreds of homeowners. That purpose is public." Appellant's Br. p. 24. Thus, these proposed takings satisfy the *Westport* test.

The Landowners, on the other hand, direct our attention to our Supreme Court's opinion in *Hawley v. South Bend Department of Redevelopment,* 270 Ind. 109, 383 N.E.2d 333 (1978). In *Hawley,* our Supreme Court cautioned that every

Hoosier landowner " 'has a right constitutionally to defend against subterfuge and bad faith in the seizure of his property, and may show that it is not to be applied to the public purpose and use as alleged.' " *Id.* at 119, 383 N.E.2d at 340 (quoting *Derloshon v. City of Fort Wayne,* 250 Ind. 163, 166–67, 234 N.E.2d 269, 271 (1968)). Furthermore, "the inquiry of the courts in this regard [i.e., bad faith and subterfuge] is not only the use which the [condemnor] purports to want to make of the property to be acquired, but also of all the surrounding facts and circumstances tending to show what is the actual, principal and real use to be made of the property." *Id.* at 120, 383 N.E.2d at 340.

Thus, the Landowners argue that the trial court followed the *Hawley* rule by examining all of the surrounding facts and circumstances tending to show what is the actual, principal, and real use to be made of the property, concluding that, in fact, the actual use was private rather than public. According to the Landowners, therefore, "the unchallenged factual findings overwhelmingly support the trial court's legal conclusion that Wymberley's proposed takings were fraudulent, undertaken in bad faith, and a subterfuge for Lynn's private use." Appellees' Br. p. 37. We cannot agree. Even if we apply the *Hawley* test, the factual findings do not support the conclusion of law that the actual use of the sewer line extension will be private. To the contrary, the factual findings establish that this sewer line extension will service a subdivision, providing sewer service to all of the homeowners who plan to purchase property therein. Service to those homeowners is a public use. Proper and safe disposal of sewage is also a public use. That the selected route is the most direct and least expensive and that Lynn took charge of the route planning process do not change the fact that

the actual, principal, and real use to be made of the proposed takings is public. Thus, we find that the trial court erred as a matter of law by concluding otherwise.

### C. Current Need

 A utility company must demonstrate an immediate or present need for private property that it seeks to take through the power of eminent domain. *Ind. & Mich. Elec. Co.,* 504 N.E.2d at 306. In other words, "[a] utility may not maintain an action of condemnation for purely speculative future needs." *Id.*

The trial court concluded that "[t]he proposed Lynn development is not in existence, no time frame exists for when it will be developed, and the number of lots that may be developed is speculative." Appellant's App. p. 28. We cannot agree. There is no speculation as to necessity in this case because "[n]ot only has the Plan Commission granted primary plat approval to the Lafayette subdivisions, but it conditioned its final approval on the extension of sewer service to them. Thus, there is nothing remote or speculative about this project." Appellant's Br. p. 30; *see also Indianapolis Power & Light Co. v. Barnard,* 175 Ind.App. 308, 314, 371 N.E.2d 408, 412 (1978) (holding that "the showing of a necessity for condemnation does not require proof that no subsequent contingencies will arise during the execution of the project such as might theoretically defeat the use of the land as originally contemplated," but also holding that "[t]he proper test of necessity correctly concerns whether the property sought will be devoted to an *immediate* public use") (emphasis added).

Indeed, the result reached by the trial court leads to a Catch–22: "there is no need for the easement because the subdivision is not finally approved, but the subdivision cannot get final approval until the easement is granted." Appellant's Br. p.

28. This result would impede development in Indiana because utility takings would be permitted to serve new developments only after those developments are finally approved, or perhaps even fully constructed. We cannot countenance such an outcome, and find that the trial court erred on this basis.

### D. Route Selection

 A landowner in an eminent domain case may challenge the selection of a utility company's route as arbitrary and capricious. *Oxendine v. Pub. Serv. Co. of Ind.,* 423 N.E.2d 612, 618 (Ind.Ct.App. 1980). A route selected must be "reasonable and proper from sound and prudent engineering practice." *Lake County Parks & Recreation Bd. v. Indiana–American Water Co., Inc.,* 812 N.E.2d 1118, 1127 (Ind.Ct.App.2004).

Wymberley observes that it is well settled that "a condemning authority is not required 'to take the shortest route between the starting point and the terminal of the line proposed. Many things may intervene, which from a public utility standpoint, and a standpoint of public safety, and public convenience, make deviations necessary.'" *Id.* (quoting *Guerrettaz v. Pub. Serv. Co. of Ind.,* 227 Ind. 556, 562, 87 N.E.2d 721, 724 (1949)). Wymberley notes that here, the utility *did* take the shortest, most direct route.

The trial court's undisputed factual findings establish that Lynn hired an engineer, who had performed similar work in the past, to design the route. The engineer selected the route that ran through the Landowners' property as the best option, testifying that he was motivated by feasibility and efficiency. Appellant's Br. p. 32. After the engineer completed his design, he provided it to Wymberley, which engaged two of its managers to examine the route and evaluate it by means of aerial

photographs, ultimately approving the route as designed.

At trial, the Landowners presented testimony and exhibits from a different engineer, who offered three alternative route suggestions. One of those suggestions ran nearly parallel to the Primavera route. The Landowners' expert ultimately concluded that a longer, costlier route that made use of the public rights of way would have been preferable.

It is evident that there were other viable routes in addition to the Primavera Route. But just because those other options existed does not mean that Wymberley's selected route was arbitrary and capricious. It "chose a shorter route, requiring fewer easements, although that route involved some rugged terrain. Any route would present problems ... far more expensive than tunneling through bare ground." Appellant's Br. p. 33. While the Landowners' expert weighed the risks and benefits differently, the Primavera Route was not chosen haphazardly. It is the utility, rather than the trial court, which is best situated to weigh the risks and benefits of the location of its lines, which is why the law defers substantially to utilities' choice of route in these cases. Thus, "[a]s a matter of law, there is nothing arbitrary or capricious about the route selected by Wymberley. It was selected by professionals after a reasonable examination of alternatives." *Id.* at 35.

We cannot agree with the Landowners' contention that Wymberley is asking us to reweigh the evidence and assess witness credibility. To the contrary, we have taken all of the trial court's factual findings and assumed them to be true. Even so, those findings do not support the trial court's legal conclusion that the selected route was arbitrary and capricious. Therefore, we find that the trial court erred as a matter of law by finding that

the Primavera Route was arbitrary and capricious.

### E. Bad Faith

 A condemning authority's taking is not necessary if it is fraudulent or made in bad faith. *Cemetery Co. v. Warren Sch. Twp.*, 236 Ind. 171, 188, 139 N.E.2d 538, 546 (1957). Here, the trial court found that Wymberley acted in bad faith for a number of reasons.

### 1. IURC Order

First, Wymberley argues that the trial court erroneously concluded that it acted in bad faith because it broke an alleged promise to the IURC that it would use public rights-of-way in extending the sewer line. Wymberley contends that it made no such promise and that IURC did not order that course of action.

The order, signed by Wymberley, provides that "Ind.Code § 36–2–2–23 requires the consent of the Commission prior to the grant by a board of county commissioners of a permit to a utility to use county property (generally roads, easements, rights-of-ways, and the like) in rendering utility service." Appellant's App. p. 173. Furthermore, the IURC "shall and does hereby consent to the Board of Commissioners of Floyd County issuing to [Wymberley] licenses, permits or franchises for the use of county property in connection with its provision of sewage disposal service within the Modified Expansion Area." *Id.* at 174. The order further noted that no party objected "to Wymberley's request for Commission consent to the use of public property for utility purposes." *Id.* The IURC then "grant[ed] its consent for Wymberley to use public rights-of-way for its rendering sewage disposal, water service facilities and services." *Id.*

We can only conclude that this language is permissive. It allows Wymberley's use

of public rights-of-way but does not require it. No one asked the IURC to limit Wymberley's route to public rights-of-way, and Wymberley never stated or implied that it would use only public rights-of-way for the proposed route. And in any event, even if Wymberley had misrepresented its intentions to the IURC, the proper entity to consider the issue would be the IURC, not the judiciary. Thus, the trial court erred by finding that Wymberley acted in bad faith based on the IURC order.

### 2. Number of Customers

Wymberley also argues that the trial court found that it acted in bad faith "because Wymberley promised the IURC that it would provide service to as many customers as possible" and the Primavera Route served only a single customer, Lynn, and possibly the Landowners as well. Appellant's App. p. 28. Initially, we note that Wymberley "made no promise to serve any number or group of customers at any particular time by any particular sewer extension." Appellant's Br. p. 41. Furthermore, although Lynn is the only customer who requested the sewer line extension, after it and the housing development are constructed, all of the homeowners who live in that development will be using the sewer service. Furthermore, if future customers seek Wymberley's service and cannot be served by the sewer lines at issue herein, then Wymberley is required to construct other lines to serve them. Thus, we find that the trial court erred by finding that Wymberley acted in bad faith based on the number of customers serviced by the sewer line extension.

### 3. Voluntariness

The trial court also found that Wymberley acted in bad faith because "the Floyd Plan Commission requires that Lynn voluntarily obtain the easements needed rather than Wymberley exercising the power of eminent domain to take the easements

from the Landowners." Appellant's App. p. 29. Wymberley argues that there is no such requirement and that, in fact, there could not be because the power of eminent domain arises from state statute and cannot be curtailed by a local body's administrative action.

The relevant ordinance provides that, "[w]hen a public sewer system has prepared and made publicly available a plan for the future expansion that will make such system available to serve the proposed subdivision, the commission shall require the developer to provide rights of way or easements for the system." Id. at 246. It is evident that this ordinance does not require that the easements be obtained voluntarily, and the record reveals no basis for the trial court's conclusion that easements may be acquired only by voluntary agreements. Thus, the finding of bad faith was erroneous on this basis.

### 4. Waiver

■■■■ The Landowners' primary response to Wymberley's arguments about the bad faith finding is that the issue has been waived. The trial court entered its order on December 27, 2007, and Wymberley filed its timely notice of appeal on January 23, 2007. Approximately one month later, this court stayed the appeal and remanded jurisdiction back to the trial court for the limited purpose of addressing two pending motions—one set of motions related to the Landowners' requests for fees and costs and the other motion concerned Wymberley's March 7, 2008, request for partial relief from judgment pursuant to Trial Rule 60(B)(8).

In its Trial Rule 60(B) motion, Wymberley challenged the trial court's findings that it acted in bad faith. The arguments in that motion are the same one it raises herein. But the Landowners argue that Wymberley's 60(B) motion was filed seventy-one days after the order was entered;

therefore, Wymberley admitted that, by that time, it had "waived its right to file a timely motion to correct errors" on the issue of bad faith. Appellees' App. p. 492.

The Landowners moved to strike or, in the alternative, to deny Wymberley's motion because it was improper under well-settled law establishing that a party may not use a Rule 60(B) motion for relief from judgment as a substitute for a direct appeal based on a timely motion to correct errors. *Vazquez v. Dulios,* 505 N.E.2d 152, 153 (Ind.Ct.App.1987). The trial court denied the motion to strike but granted "that part of the Landowners' motion asking [that] the.... [Trial Rule 60(B)] motion be denied." Appellees' App. p. 677. Wymberley did not appeal this ruling. Thus, the Landowners argue that the ruling is final. They argue that this determination is significant because the Trial Rule 60(B) motion "is the only context in which Wymberley challenged the merits of the trial court's bad faith findings...." Appellees' Br. p. 47.

We cannot agree and find that the Landowners are elevating form over substance to a degree that we cannot countenance. Wymberley filed a timely notice of appeal of the order containing the bad faith findings. Therefore, the claim of error was preserved for appeal. The Landowners have cited no authority supporting the proposition that an appeal on the merits of an issue adjudicated at trial is waived by failure to appeal the denial of a 60(B) motion. Under these circumstances, we find that Wymberley has not waived its right to appeal the trial court's bad faith findings.

### III. Attorney Fees

▮ Next, Wymberley argues that the trial court erroneously awarded attorney fees and costs to the Landowners. Inasmuch as we have found that (1) the trial court erroneously concluded that Wymberley acted in bad faith and (2) judgment should have been entered on Wymberley's behalf, we also reverse the attorney fee award.

That conclusion notwithstanding, we note briefly that the statute cited by the Landowners and the trial court in awarding the attorney fees is Indiana Code section 34–52–1–1, which permits an award of attorney fees if a party has "litigated the action in bad faith." I.C. § 34–52–1–1(b)(3). But there has been no allegation or finding that Wymberley has *litigated* in bad faith. Even if we had agreed with the trial court that Wymberley acted in bad faith in its dealings with the Landowners before the lawsuit was filed, neither caselaw nor the plain language of the statute support an award of attorney fees for actions taken outside the litigation. In either event, therefore, we would have reversed the attorney fee award.

The Landowners cross-appeal, arguing that the trial court erroneously denied their request for $7,785.50 incurred while preparing and defending the fee petitions. For the reasons just explained, we find that the trial court properly denied this fee request.

### CONCLUSION

In sum, we find that the trial court erred as a matter of law by finding that Wymberley made improper offers to purchase the requested easements, that the proposed takings are not for a public use, that there is no current need for the takings, and that Wymberley acted in bad faith. Similarly, we find that the trial court erred by awarding attorney fees to the Landowners and acted correctly by denying a portion of those requested fees.

The judgment of the trial court is affirmed in part, reversed in part, and re-

manded with instructions to enter final judgment in Wymberley's favor.

NAJAM, J., and CRONE, J., concur.